Clarence **JOHNSON IV,** Denise Johnson and Primecare Health Plan, Inc., Plaintiffs,

v.

**CITY OF MILWAUKEE** and Robert Brown, Defendants.

No. 98–C–149.

United States District Court, E.D. Wisconsin.

Feb. 25, 1999.

The Mahons make a claim of promissory estoppel in their proposed amended complaint.

Michael J. Donovan, Robert L. Elliott, Milwaukee, WI, for plaintiffs.

Susan E. Lappen, Milwaukee, WI, for defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

### I. FACTUAL AND PROCEDURAL BACKGROUND

On the night of March 26, 1997, plaintiff Clarence Johnson IV, age 17, and a friend, Larry Moore, age 15, were riding their bikes in an alley off of Center Street in the City of Milwaukee. They encountered an unidentified young man with whom they exchanged words. Then a fight broke out between them and the unidentified male. The unidentified male was on the ground, and Johnson and Moore were bent over him when a car driven by defendant Robert Brown, an off-duty City of Milwaukee police officer, passed by. Brown was driving his girlfriend, Vicki Ricks, home after an evening out.

Brown observed the fight involving Johnson, Moore and the unidentified male. He stopped his car and responded to the incident as he was required to do by City of Milwaukee police regulations. He got out of the car, telling Ricks to call 911 on the car cell phone. Brown saw Johnson's and Moore's bicycles nearby, and he observed the unidentified male run from the scene.

The parties differ in some respects about what happened next. Plaintiff Clarence Johnson's version is as follows: Brown drew his gun, identified himself as a police officer and told Johnson to freeze. Moore fled the scene leaving Johnson standing there by himself. At this point Brown had two hands on his gun and was pointing the gun directly at Johnson. Johnson, however, did not flee or resist but stopped and put his hands up in a surrender position.

According to Johnson, Brown then came rushing at him while continuing to hold the gun. When Brown got close to Johnson, Brown grabbed him from behind and tried to throw him against the fence. Brown pushed, grabbed and was "slinging" Johnson in an effort to get him against the

fence. Brown put a "half-Nelson" wrestling-type hold on Johnson. Johnson's hands were still up in the air in a surrender position. Johnson states that he next felt Brown's left hand grabbing him and Brown's right arm under his armpit. Johnson saw Brown's gun when he looked down. Brown at some point pushed Johnson into the fence, and Johnson bounced off it with his face and chest.

After Johnson bounced off the fence he states that he saw Brown's fist come up in a swinging motion, and he felt some metal hit his teeth; according to Johnson Brown struck him in the face with the gun. Several seconds after Johnson was hit with the gun, the gun discharged. At this point Johnson looked down and saw blood. Johnson spit out his teeth and knew that he had been shot. The bullet shattered his teeth and exited through his left cheek. His arms were still up in the air when he was shot. Johnson said that the whole incident lasted about a minute and a half after which an ambulance came and took him to the hospital.

Brown's version of the incident is this: after he saw Johnson, Moore and the unidentified male, Brown thought that a battery had occurred, and he regarded Johnson as a suspect. He intended to detain Johnson for the purpose of investigating the incident. He believed that back-up in the form of on-duty officers would arrive within thirty to forty-five seconds after the 911 dispatcher called them.

Brown states that he exited the vehicle, drew his gun in his right hand and identified himself as a police officer. Johnson then stood still and put his hands up in a surrender position. Johnson appeared to be nervous. Brown states that while holding his badge in his left hand and his gun in his right hand, he approached Johnson. Brown closed the distance between himself and Johnson and grabbed Johnson's coat. Brown then escorted Johnson over to the fence while grabbing him with his right hand near the back of Johnson's right armpit. Brown held his gun in his right hand while grabbing Johnson with the same hand. Brown states that he continued to hold his badge in his left hand with two fingers, and he used the other two fingers and thumb of his left hand to hold Johnson's coat.

According to Brown, after putting Johnson against the fence he wanted to put his gun away to free his right hand so that he could search Johnson for possible weapons. Johnson was fidgety and nervous. Brown states that while he was trying to secure his firearm he put pressure on Johnson's back and pushed him into the fence. At this point Brown's gun was located under Johnson's right armpit. Brown states that Johnson made a movement, and Johnson's right elbow struck Brown's right forearm and caused the gun to discharge. Brown denies that he struck Johnson in the face with the gun shortly before it discharged. He states that he did not intend for the weapon to discharge.

Johnson, who was a minor, his mother Denise and their subrogated insurer, Primecare, sued Brown and the City of Milwaukee in the Milwaukee County Circuit Court, pursuant to 42 U.S.C. § 1983. Johnson alleged that Brown violated his constitutional rights by arresting him without probable cause and by using excessive force, and that the City violated his constitutional rights by failing to properly train and supervise Brown. Johnson also brought a state law negligence claim against Brown. Defendants removed the case to federal court and now move for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of

some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248, 106 S.Ct. 2505.

The moving party has the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once this burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989). Both parties must produce documentary evidence to support their contentions. *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

## III. DISCUSSION

The Fourth Amendment protects persons against "unreasonable search and seizures" and against arrests without probable cause. U.S. Const. Am. IV. In his complaint Johnson alleged that his arrest violated the Fourth Amendment because it was not based on probable cause and because officer Brown used excessive force and therefore acted unreasonably.

### A. Probable Cause

■ A law enforcement officer has probable cause to arrest when the facts and circumstances within his knowledge are sufficient to warrant a prudent person in believing that the suspect had or was committing an offense. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). A court can decide that probable cause existed as a matter of law if no reasonable jury could find that the officer lacked probable cause. *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir. 1993).

■ Here, Brown states that he saw Johnson and Moore beating a third party in an alley. Johnson does not dispute that he and Moore were fighting with a third party who was on the ground. Charges were never brought against Johnson. This fact, however, does not negate the existence of probable cause. *Humphrey v. Staszak,* 148 F.3d 719, 728 (7th Cir.1998). Brown reasonably believed that Johnson was committing a battery and, therefore, had probable cause to arrest. No reasonable jury could find otherwise. Therefore, summary judgment will be granted on Johnson's claim that he was arrested without probable cause.

## B. Excessive Force

### 1. Applicability of Fourth Amendment

■ Johnson alleges that, in detaining him, Brown used excessive force. All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a citizen who is not in custody are analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Thus, the first question to be addressed in analyzing Johnson's claim is whether a seizure occurred.

In *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a seizure occurs when a government actor has "by means of physical force or show of authority ... in some way restrained the liberty of a citizen." *See also Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person."); and *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (a seizure "requires an intentional acquisition of physical control").[1]

■ Here, Brown clearly seized Johnson. Brown drew his gun, pointed it at Johnson, identified himself as a police officer and told Johnson to freeze. Johnson thereupon complied with Brown's command by standing still and putting his hands up. Brown, therefore, both by means of physical force (drawing his gun) and by show of authority (identifying himself as a police officer), restrained Johnson's liberty. Moreover, Brown did so intentionally. Additionally, Johnson fully yielded to Brown's authority. *See California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Thus, Brown seized Johnson within the meaning of the Fourth Amendment.

Johnson alleges that after he surrendered Brown rushed toward him with gun in hand, grabbed him, pushed him up against the fence and hit him in the lip with the gun after which the gun discharged in his face. Are these alleged acts governed by the Fourth Amendment? *Graham* states that the Fourth Amendment provides protection against excessive force to individuals "in the course of an arrest," *Graham*, 490 U.S. at 395, 109 S.Ct. 1865. The protection lasts at least until "the point at which the arrest ends and pretrial detention begins." *Id.* at 395 n. 10, 109 S.Ct. 1865.

■ The Seventh Circuit has held that the Fourth Amendment remains the source of protection against excessive force until the "arrest has taken place and the arrested person has been placed securely in custody." *Wilkins v. May*, 872 F.2d 190, 193 (7th Cir.1989). Once a seizure has occurred it continues until the arrestee is in the company of the arresting officers. *Lester v. City of Chicago*, 830 F.2d 706, 713 n. 7 (7th Cir.1987).[2] In the present case, when Brown committed the acts complained of, he was carrying out the process of detaining or arresting Johnson. Johnson was not yet securely in custody. Thus Brown's acts should be analyzed under the standard of the Fourth Amendment.

### 2. Reasonableness

#### a. The nature of the standard

■ Reasonableness under the Fourth Amendment involves balancing the extent of the intrusion against the need for

---

1. In recent years the Supreme Court has defined a "seizure" in several slightly varying ways. *See* Kathryn R. Urbonya, *"Accidental" Shootings as Fourth Amendment Seizures*, 20 Hastings Const.L.Q. 337 (1992). Under any of the definitions, however, Brown's acts in this case constituted a seizure.

2. *See generally* Mitchell W. Karsch, *Excessive Force & the Fourth Amendment: When Does Seizure End?*, 58 Fordham L.Rev. 823 (1990).

it. *Garner,* 471 U.S. at 5, 105 S.Ct. 1694. Determining whether acts are reasonable requires careful attention to the facts and circumstances of the case. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Three important factors to consider are the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.; see also Frazell v. Flanigan,* 102 F.3d 877 (7th Cir.1996).

■ The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force necessary in a particular situation. *Graham,* 490 U.S. at 397, 109 S.Ct. 1865.

■ The reasonableness inquiry is an objective one: whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force, nor will an officer's good intentions make an objectively unreasonable use of force constitutional. *Id.*

■ In the Seventh Circuit the test of whether a search and seizure challenged under the Fourth Amendment is unlawful is the same as the test of negligence at common law: unreasonableness in the circumstances. *Villanova v. Abrams,* 972 F.2d 792, 796 (7th Cir.1992). In *Villanova* now Chief Judge Posner expressed this test in terms of Learned Hand's famous formula for negligence, B<PL, where B is the burden of precautions, L is the loss if there is an accident that the precautions could have prevented, and P is the probability of an accident if the precautions are

not taken. *Id.; United States v. Carroll Towing Co.,* 159 F.2d 169, 173 (2d Cir. 1947).

■ Thus I will analyze Brown's actions by considering them in light of the *Graham* factors and the Hand formula and seek to determine whether they were objectively reasonable in the circumstances. In addition, the Seventh Circuit has evaluated the reasonableness of an officer's conduct under the Fourth Amendment by separately analyzing each of the officer's actions that may be relevant to the excessive force claim. *See Tom v. Voida,* 963 F.2d 952, 956 (7th Cir.1992). Such an approach makes sense in the present case where a number of arguably relevant acts preceded the discharge of the officer's weapon.

### b. Reasonableness of Brown's Acts

■ Brown's first relevant action was to draw his gun. He had just observed what he reasonably believed might have been a battery. The individuals involved in the fight could have been armed. Even if he intended only to detain rather than arrest Johnson, there is no per se rule against the use of a weapon during an investigatory stop. *United States v. Ocampo,* 890 F.2d 1363, 1369 (7th Cir. 1989). Brown had a right to protect himself, *Terry,* 392 U.S. at 20, 88 S.Ct. 1868, and to pursue his investigation without fear of violence, *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Thus, his decision to draw his gun was reasonable.

■ Brown's second relevant action or set of actions was to close in on Johnson and initiate physical contact with him by grabbing and pushing him up against the fence. Brown states that he committed these acts while holding his badge in his left hand and his gun in the right. Brown states that the reason he grabbed Johnson and pushed him against the fence was because he wanted to search Johnson for

possible weapons and to achieve greater control over him.

Were these actions reasonable in light of the *Graham* factors, i.e., the severity of the crime, whether the suspect posed an immediate threat to the safety of the officer or others and whether the suspect was actively resisting arrest or attempting to flee?

(1) *Severity of the crime:* Brown previously observed Johnson and Moore bending over an unidentified male on the ground. When Brown came on the scene the unidentified male got up and ran away. Thus, Brown had reason to believe that Johnson committed some offense, probably a battery. Wisconsin Statute § 940.19 identifies several levels of battery based on the nature of the perpetrator's intent and the degree of harm to the victim.

In this case, if Johnson committed an offense it was probably a low level battery, either a class A misdemeanor or a class E felony. Brown observed no weapons. And the harm to the victim was not serious enough to have prevented him from running away. Finally, Brown's statement that he intended to detain Johnson for further investigation indicates that he did not regard the matter as so grave as to mandate an arrest.

(2) *Immediacy of threat:* Did Johnson pose an immediate threat to the officer or others? When Brown drew his gun and identified himself as a police officer to Johnson, Johnson immediately surrendered by standing still and putting his hands up. At this point he posed no immediate threat to the officer. Johnson did not have a weapon in his hand. It is, of course, possible that he had a weapon concealed on his person but with his hands in the air it would not have been easily accessible. No other people were close by so Johnson did not pose a threat to others either.

(3) *Resistance or flight:* The third *Graham* factor is whether the suspect was actively resisting arrest or attempting to flee. Neither factor is present here. Johnson immediately surrendered to Brown and made no attempt to resist or to run.

Consideration of the *Graham* factors, therefore, raises genuine questions about the reasonableness of Brown's conduct. Even if Brown regarded Johnson as a threat, with his gun on Johnson and Johnson's hands in the air, Brown need not have closed in on, grabbed and pushed Johnson against the fence. Brown could have taken precautions which would have increased both Johnson's safety and his own. One precaution would have been to maintain the status quo until on-duty back-up arrived. Brown knew that Ricks had called 911, and that back-up would arrive in minutes, if not seconds. He had Johnson under control and would have lost nothing by refraining from escalating the level of force.

Sergeant Jay Martyka, a City of Milwaukee police officer and an expert for defendants, testified that according to the manual used to train police officers the first option for taking control of a subject was verbal control, also known as empty hands control. This technique amounts to talking to the suspect. "You ask them. You tell them. You lay out the options to them. That's without even putting hands on." (Martyka Dep. at 39.) When asked whether an officer with gun drawn should come into physical contact with a suspect Martyka replied: "It's recommended that he doesn't." (*Id.* at 37.) Brown did not attempt to use the option of verbal control.

Another precaution that Brown could have taken would have been to require Johnson to lie down on the ground. This would have made it safer for Brown to carry out a frisk for weapons. In *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir.1994), the Seventh Circuit stated that "when a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he carries any weap-

ons." According to Johnson's expert witness, Professor George F. Kirkham, a professor of criminology and criminal justice, another option, not quite as safe as requiring the suspect to lay down but sometimes used, would have been to order Johnson to assume a leaning position against the fence.

Professor Kirkham also stated that Brown's act of closing in on Johnson and coming into physical contact with him while Brown was holding a pistol was unreasonable and created a high and unwarranted risk of danger to the officer and the subject. Kirkham stated that if Brown was concerned about Johnson carrying a concealed weapon, the appropriate response would have been to maintain the control which he had established, but not initiate physical contact with a gun drawn. Professor Kirkham said: "Yeah, he [Johnson] might have a weapon on him, but you're to keep your weapon trained on him in a ready-to-use position, until help gets there, but you're not going to get within reach proximity of this guy to do a frisk because it's too dangerous." (Kirkham Dep. at 54.)

Johnson also presented several documents from the Law Enforcement Standards Board of the Wisconsin Department of Justice. These documents, entitled "Demonstrate Defensive and Arrest Tactics" and "Demonstrate Care and Use of Firearms," are used as training guides for police officers by local police departments including the Milwaukee Police Department. The documents emphasize that once control over a suspect has been achieved the use of force should be de-escalated to a level sufficient to maintain control. Of course, neither Dr. Kirkham's opinion nor the training materials are dispositive. They do, however, constitute additional evidence suggesting that Brown's actions were unreasonable.

Finally, I find that applying Learned Hand's classic formula, $B < PL$, to Brown's actions is illuminating on the issue of reasonableness. In assessing the burden of precautions under the Hand formula I will consider whether imposing a burden on officer Brown would have even slightly increased the possibility of harm to individuals and the community. Kathryn R. Urbonya, *Dangerous Misperceptions: Protecting Police Officers, Society & the Fourth Amendment Right to Personal Security,* 22 Hastings Const.L.Q. 633, 669 (1995).

In this case the possibility of harm to individuals or the community if officer Brown had waited for back-up, used verbal control or ordered Johnson to the ground before frisking him was non-existent. If Brown had waited for back-up or put Johnson on the ground, his own safety and Johnson's would have been enhanced. Brown's weapon would not have come in contact with Johnson, and the possibility of an accident occurring would have been dramatically reduced. Thus, in the language of the Hand formula, the burden of precautions, B, was zero.

P, the probability of an accident occurring if precautions were not taken was very high. The probability of Brown's weapon accidentally discharging while he was simultaneously holding it in his hand and pushing, grabbing and holding Johnson was substantial. L, the loss that could have been prevented by Brown's having taken the suggested precautions, was also high. The discharge of a firearm could have caused great harm—even death—to the officer or the suspect. In sum, a reasonable jury considering the officer's conduct in light of the Hand formula could conclude that the burden of precautions was less than the probability of an accident times the potential loss and that Brown's actions were therefore unreasonable.

It remains to consider under the reasonableness standard Brown's alleged striking of Johnson with his gun several seconds before the gun discharged. Brown denies that he struck Johnson with the gun but for purposes of this motion I must assume that Johnson's allegation is true. If the

jury found that Brown intentionally struck Johnson with his gun, the jury could also find such act to have been unreasonable. Further, the jury could also reasonably find that if Brown struck Johnson with the gun, the striking contributed to the accidental discharge of the firearm. It would not be unreasonable to conclude that hitting a person with a loaded gun could cause the gun to discharge.

### 3. Whether Fourth Amendment Implicated by Accidental Shooting

■ Relying on *Brower* and *Campbell v. White*, 916 F.2d 421 (7th Cir.1990), defendants argue that accidental shootings as a matter of law do not implicate the Fourth Amendment. *Brower* held that a seizure had to be intentional, and *Campbell*, which involved an accidental death after a high speed chase, followed *Brower*. Neither *Brower* nor *Campbell*, however, is dispositive of the present case, as they addressed a different issue. The issue in *Brower* and *Campbell* was whether a seizure occurred. Here, there can be no doubt that Brown seized Johnson. Rather, the issue presented is whether the seizure was carried out reasonably.[3]

The question of whether a seizure occurred is distinct from that of whether a seizure was carried out in a reasonable manner. *Garner*, 471 U.S. at 8, 105 S.Ct. 1694 (reasonableness depends on not only when a seizure is made but also how it is carried out); *Brower*, 489 U.S. at 599, 109 S.Ct. 1378 (seizure alone is not enough for § 1983 liability; the seizure must be unreasonable); *see also Pleasant v. Zamieski*, 895 F.2d 272, 277 (6th Cir.1990) (the inquiry as to whether some action constitutes a seizure is distinct from whether a seizure is unreasonable under the Fourth Amendment); *Leber v. Smith*, 773 F.2d 101, 105 (6th Cir.1985) (driver stopped by roadblock had been seized but officer still required to show that his subsequently approaching the suspect with a gun was reasonable).

Defendants appear to suggest that because a seizure must be intentional it follows that Johnson cannot recover for harm not specifically intended by Brown even if the harm resulted from Brown's unreasonable conduct while detaining or arresting Johnson. The Seventh Circuit stated that the test of lawfulness under the Fourth Amendment is the same as the test of negligence at common law: unreasonableness in the circumstances. *Villanova*, 972 F.2d at 796. At common law a person who acts unreasonably in the circumstances is liable for the damages caused by his actions. Wis. JI–Civil 1500.

■ By the same token, if police conduct is unreasonable under the Fourth Amendment, the plaintiff can recover the damages caused by such conduct. It is not

---

**3.** The *Brower* requirement that a seizure be "intentional" does create difficult analytical problems in considering whether an accidental police shooting, even if reckless, can constitute a seizure. The answer may depend on whether one focuses only on the act of shooting or on the shooting and the conduct preceding it. The *Brower* definition also raises the question of whether the required intent is the intent to stop or the intent to harm. *See* Kathryn R. Urbonya, *Accidental Shootings as Fourth Amendment Seizures*, 20 Hastings Const. L.Q. 337, 380 (1992).

In the present case, however, even if the question was whether the shooting constituted a seizure, rather than one of reasonableness, Johnson would have a strong argument under *Brower* that a seizure occurred. In *Brower*, the court said that the intentionality requirement was met when a person was stopped "by the very instrumentality set in motion or put in place in order to achieve that result." *Brower*, 489 U.S. at 599, 109 S.Ct. 1378. In the present case, the instrumentality set in motion to effectuate the seizure was Brown's gun. This case resembles the hypothetical used by the *Brower* court as an example of a seizure. In *Brower* the court said that one could not draw too fine a line when "determining whether the means that terminates the freedom of movement is the very means that the government intended ... or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned...." *Id.* at 598–99, 109 S.Ct. 1378.

required that the police specifically intend to cause such damages. The word "accident" is not a talisman for releasing an officer from liability. *See Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir.1970) (after a constitutional violation has been made out a showing of intent to injure is not a further prerequisite to recovery under section 1983); *Patterson v. Fuller*, 654 F.Supp. 418, 426 (N.D.Ga.1987) (in an accidental shooting case in order to prevail on Fourth Amendment claim, plaintiff must prove that officer acted negligently in having his gun cocked while standing over plaintiff's head).

In emphasizing the accidental nature of the shooting defendants focus too narrowly on the end result of the alleged conduct. In excessive force cases, the Seventh Circuit has indicated that the reasonableness of a course of conduct cannot be assessed by looking only at the end result. *See Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir.1993). Where a shooting occurs, an inquiry into reasonableness requires scrutiny of the conduct leading up to the shooting. The relevant time frame that the court considers is broader than the moment the gun went off. In *Starks*, the court found all police actions prior to a fatal shooting to be relevant and criticized the police for creating the dangerous situation that justified the use of deadly force.

A firearm does not discharge in a vacuum. The critical question is how the shooting came about. If the cause of the shooting was prior police conduct that was unreasonable under the Fourth Amendment, the accident is compensable.

For the reasons stated in my analysis of the reasonableness of Brown's acts, as well as in my discussion of defendants' arguments, and drawing all inferences in the light most favorable to Johnson, Johnson has presented sufficient evidence to withstand Brown's motion for summary judgment on the issue of reasonableness. A reasonable jury could find that Brown's conduct was objectively unreasonable under the Fourth Amendment.

### 4. Qualified Immunity

Brown argues that summary judgment nevertheless must be granted on the excessive force claim based on the defense of qualified immunity. In considering the qualified immunity issue I follow the usual summary judgment methodology, *Green v. Carlson*, 826 F.2d 647, 651 (7th Cir.1987), drawing all inferences in the light most favorable to the non-movant.

Under the doctrine of qualified immunity "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Once a defendant has pleaded a defense of qualified immunity courts engage in a two step analysis: (1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question? *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). I have already answered question (1) by determining that a reasonable jury could conclude that a constitutional violation occurred.

On question (2), plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir.1996). Plaintiff may do so by (a) pointing to a closely analogous case that established a right to be free from the kind of force used on him, or (b) showing that the force was so plainly excessive that, as an objective matter, the officer would have been on notice that he was violating the Fourth Amendment. The point is to be able to conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand and molded their conduct accordingly. *Lojuk v. Johnson*, 770 F.2d 619, 628

(7th Cir.1985). Plaintiff thus shoulders a heavy burden, and appropriately so, because qualified immunity is designed to shield from civil liability " 'all but the plainly incompetent or those who knowingly violate the law.' " *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir.1989) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

 The Seventh Circuit has recognized, however, that the excessive force standard is well settled and, since it is already an objective standard based on a reasonable police officer, qualified immunity normally will not apply. *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 476–77 (7th Cir.1997). The court, however, left open the possibility that the law may be sufficiently unsettled to justify application of the defense in a particular case. *Id.* at 477.

 I have found no case precisely analogous to the one before me. However, I see nothing in the case suggesting that qualified immunity should apply. As an objective matter, the police officer should have been on notice that it was unreasonable under the Fourth Amendment to commit the following acts while holding a gun on a suspect who had surrendered and was standing still with his hands in the air: (1) rush the suspect, (2) grab him, (3) push him against a fence, (4) bounce him off the fence, (5) place him in a half-Nelson, (6) thrust the loaded gun under his armpit, and (7) strike him in the face with the gun. Qualified immunity is not designed to shield from civil liability the plainly incompetent. *Malley*, 475 U.S. at 341, 106 S.Ct. 1092. If officer Brown committed the acts alleged by Johnson his conduct may well fall into this category. Thus, summary judgment on the defense of Brown's qualified immunity is inappropriate.

## C. Failure to Train

Johnson also claims that the City of Milwaukee failed to properly train its police officers and that this failure caused Brown to deprive Johnson of his constitutional rights.

 A municipality is liable under section 1983 if a custom, policy or practice of the municipality causes a plaintiff's injury. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under some circumstances a city can be liable under § 1983 for failure to train. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387–88, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). However, the inadequacy of police training may serve as the basis for § 1983 liability only where it amounts to deliberate indifference to the rights of persons with whom the police come in contact. *Id.* at 388, 109 S.Ct. 1197. Only then can a failure to train be thought of as a city policy or custom that is actionable under § 1983. *Id.* at 389, 109 S.Ct. 1197.

 In the Seventh Circuit deliberate indifference requires that the municipality must act intentionally or with criminal recklessness. *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir.1991). In a failure to train case the need for enhanced training must be so obvious and the inadequacy of training so likely to result in the violation of constitutional rights, that a jury could reasonably attribute to policymakers a deliberate indifference to the training needs. *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir.1989).

 Johnson alleges that the City's training of police officers was deficient in one respect: it failed to instruct officers that when they have a compliant subject held at gun point, officers should keep a reasonable distance from the subject. In support of this position Johnson presented the affidavit of Professor Kirkham who opined that the City of Milwaukee's training materials are deficient on this point, and that this deficiency directly led to Brown's shooting of Johnson.

The City's response to Kirkham's opinion is that the training of Milwaukee police

officers and other police officers in Wisconsin is governed by state law and that state law has established the Law Enforcement Standards Board to prescribe minimum requirements for police officer training. *See* Wis.Stat. § 165.85(3). The Board has issued regulations governing police officer training standards in such areas as defensive and arrest tactics, effecting an arrest, weapon retention and accidental shootings. Further, the City indicates that officer Brown received training in these subjects, which complied with the minimum state requirements.

The Seventh Circuit's decision in *Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir.1992) is dispositive of this claim. In *Tapia* the question was whether the defendant city had adequately trained police officers regarding procedures for warrantless searches. The city showed that it was in compliance with the minimum standards for training police officers under Indiana law and that the officers involved had received such training. The court held that where the state imposed minimum training standards on municipalities evidence showing adherence to those standards barred any finding that the city's policymakers were deliberately indifferent to the need for better training. *Id.* at 339. While it is possible that the state's minimum standards do not adequately address the issue raised by Professor Kirkham, under *Tapia*, compliance by a municipality with such standards defeats any possibility that a reasonable jury could uphold a charge of deliberate indifference. Summary judgment on this claim therefore is warranted.

**D. Failure to Supervise**

Johnson also claims that the defendant City failed to properly supervise its police officers regarding the use of force and that this failure caused Brown to violate Johnson's constitutional rights. The summary judgment methodology remains the same, as does the rule that municipal · liability must be based on an unconstitutional policy.

■ Liability based on failure to supervise requires that the supervisor know of the subordinate's conduct and approve of it. *Lanigan*, 110 F.3d at 477. The supervisor must be personally involved in the conduct. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988). Personal involvement means acting knowingly or with deliberate reckless indifference rather than mere negligence. *Jones* at 992–3.

■ Johnson bases his claim of supervisory liability on several facts: (1) that instead of being required to fill out a written report immediately after the incident the City permitted Brown to make a statement two days later with his lawyer present; (2) that Johnson's supervisors did not immediately order Johnson to take a blood test after the incident, even though they knew he had spent part of the evening in a bar; and (3) that Johnson was not disciplined as the result of this incident itself but received only a two-day suspension several months later for having an unauthorized off-duty gun at the time.

While some or all of these complaints may be legitimate they do not constitute sufficient evidence from which a reasonable jury could infer that Johnson's injuries were caused by an existing unconstitutional policy. Brown's supervisors ensured that Brown fulfilled his probationary period and that he received annual training. Because this was a single incident Brown's supervisors had no reason to anticipate it.

Further, no supervisor was personally involved in the incident. The City's actions subsequent to the incident, while lacking the urgency one might hope for, do not amount to approving or condoning Brown's behavior. Therefore, Johnson's claim against the City based on supervisory liability cannot survive defendants' motion.

**932**

### E. State Law Claim

■ Johnson also brought a negligence claim against Brown under state law. Brown moves for summary judgment on this claim, arguing that Brown is immune from suit under Wis.Stat. § 893.80(4), which bars suits against public employees based on acts performed in the exercise of "legislative, quasi-legislative, judicial or quasi-judicial functions." The acts covered by immunity are generally known as discretionary acts. The general rule is that public employees are immune from acts within the scope of their public office. *Barillari v. City of Milwaukee*, 194 Wis.2d 247, 533 N.W.2d 759 (1995).

■ There are three exceptions to the general rule of immunity: (1) where the conduct is malicious, willful or intentional; (2) where there is negligence in the performance of a ministerial duty; and (3) where a public officer is aware of a danger of such quality that his duty to act becomes absolute, certain and imperative. Id. at 257–58, 533 N.W.2d 759. The most generally recognized exception to the rule of immunity is the situation where there is negligent performance of a ministerial duty. *Lister v. Board of Regents of Univ. of Wis. Sys.*, 72 Wis.2d 282, 240 N.W.2d 610 (1976). However, a "duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Id.* at 301, 240 N.W.2d 610.

■ Johnson argues that Brown's actions in this case come within this exception. However, under Wisconsin law the decisions of whether and how to arrest an individual involve discretion. In *Sheridan v. City of Janesville*, 164 Wis.2d 420, 474 N.W.2d 799 (Ct.App.1991), the plaintiff sued a city and two police officers for injuries suffered during an arrest. The court held that the conduct of the officers in executing the arrest was not ministerial but discretionary. The court stated that the officers were required to determine whether Sheridan should be searched, handcuffed, subjected to force during execution of the arrest and given a Breathalyzer, and that these decisions involved discretion. *Id.* at 427–28, 474 N.W.2d 799; *see also Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir.1997).

Johnson argues that the materials provided by the Wisconsin Department of Justice to local police departments imposed on Brown mandatory or ministerial duties with respect to the procedures used in detaining Johnson. These documents, however, while providing necessary guidance, do not replace the discretion of the officer. Thus, Brown's actions in this matter were discretionary and not outside the protection of Wis.Stat. § 893.80(4).

### VI. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART:** the motion is **DENIED** as to Johnson's claim of excessive force; the motion is **GRANTED** as to Johnson's federal claims of failure of probable cause, failure to train, failure to supervise, and as to his state law claim.