**ESTATE OF Clarence Michael THURMAN, III, by its Special Administrator Janice Thurman, Estate of Carmen Evans, a minor, by Sabrina Evans, her general guardian, and Janice Thurman, Plaintiffs,**

v.

**CITY OF MILWAUKEE, Arthur Jones, and Keith Bernard Miller, Defendants.**

No. 99–C–877.

United States District Court, E.D. Wisconsin.

March 29, 2002.

Kenneth M. Flaxman, Chicago, IL, for Plaintiffs.

Susan E. Lappen, Milwaukee, WI, for Defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiffs, the estate and survivors of Clarence Michael Thurman III, bring this action under 42 U.S.C. § 1983 against former Milwaukee police officer Keith Bernard Miller, who shot and killed Thurman subsequent to chasing and apprehending him, after Thurman stole a lawn mower from Miller's garage. Plaintiffs allege that Miller used excessive force in violation of the Fourth and Fourteenth Amendments. Plaintiffs also bring state law assault and battery and wrongful death claims against Miller and the City of Milwaukee.[1] Defendants now move for summary judgment.

---

1. Plaintiffs initially brought other claims in-   cluding one against Milwaukee Police Chief

## I. FACTS

In the afternoon of August 3, 1996, defendant Miller was off duty and at home. His son told him that there was a man in their garage. Miller went to the garage and saw Thurman walking out of the garage pulling Miller's lawn mower. Miller followed Thurman with his police revolver drawn, pointed the gun at Thurman and said something to the effect of "bring my lawn mower back." (Pls.' Resp. to Defs.' Proposed Findings of Fact, Ex. 1 at 74.)

A group of neighborhood boys observed the incident. None of the boys heard Miller identify himself as a police officer or saw him display a badge. Miller was wearing shorts and had no shoes on.

Thurman left the lawn mower and tried to flee. Miller apprehended him in an alley adjacent to his garage and grabbed him by the shirt collar. With his gun in one hand, he bent Thurman over and started punching him and kicking him in the stomach. One of the neighborhood boys, Calvin Green, testified that Miller pointed his gun at Thurman's head and threatened to kill him. Green said that Miller hit Thurman four to seven times with his gun.

At a certain point Miller's wife drove up. Thurman escaped Miller's grip by pulling out of his t-shirt and fled. Miller asked the boys if any of them knew the man who had run off and ascertained that one of them, Robert Spencer, knew where Thurman lived. Miller told Spencer to wait, and he went into his house and put his shoes on. He did not telephone the police or ask his wife to do so.

Miller's wife tried to dissuade her husband from chasing Thurman. Green said that Miller's wife told him "don't go blowing off your head," and Miller responded,

"I'm just going to beat him down some more." (*Id.* at 15, 24.)

Miller got into his wife's van and told Spencer to show him where Thurman lived. Spencer got into the van with Miller and directed him to an alley in the vicinity of North 40th Street and Hampton Avenue where they saw some men in a garage. Spencer remained in the van while Miller got out and talked to the men.

Miller then got back into the van and drove off. Shortly after, Spencer observed Thurman several blocks away and pointed him out to Miller. Miller then drove his van at high speed, "about 65, 70" miles per hour in the alley toward Thurman. (Def.'s App., Ex. I at 20, 42.) Spencer said that Miller's driving scared him, and that Miller almost hit several children. Miller then got out of the van and ran after Thurman. Spencer heard a shot a minute or two later.

Miller shot and killed Thurman. The only witness to the shooting was Michael Jones, who was then seven years old. Jones testified at deposition that when he saw Miller and Thurman they appeared to be boxing, and that Miller pulled a gun from his pocket and was trying to shoot it. He did not hear Miller identify himself as a police officer. He saw the gun fall to the ground, observed the two men struggle for the gun, heard a shot and saw Thurman fall down.

Miller testified at deposition that he had been on the police force for about a year and a half when the incident occurred. He further stated that he stopped working as a police officer in early 1997, was subsequently found to be disabled and was not presently employed. He testified that on August 3, 1996, when his son told him that

---

Arthur Jones. However, they now agree that all such claims including that against Jones

should be dismissed.

a man was in the garage, he ran out with his gun in his hand, observed Thurman and identified himself as a police officer. He testified that Thurman tried to flee, and that he pursued and then caught him. He stated that he struck Thurman a number of times, but that Thurman ran away.

Miller testified at deposition that, prior to pursuing Thurman, he did not call for backup although "nine times out of ten, most likely I would call for backup." (Def.'s App., Ex. F at 99.) He stated that after he pursued Thurman in the van and caught him, the two of them struggled, and Miller's gun fell out of his pants onto the ground. Miller testified that he picked the gun off the ground and that Thurman came at him, and he shot him.

## II. SUMMARY JUDGMENT

### A. Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; the requirement is that there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judg-

ment, *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248, 106 S.Ct. 2505.

The moving party has the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once this burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989). Both parties must produce documentary evidence to support their contentions. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

In deadly force cases the threshold for refuting self-defense claims at the summary judgment stage is relatively low. *Plakas v. Drinski*, 19 F.3d 1143, 1146–47 (7th Cir.1994). Where the officer defendant is the only witness left alive to testify, the award of summary judgment to the defense may be made only with particular care. *Id.* at 1147.

## B. Consideration of Inquest Testimony

█ The present case presents an issue concerning the materials that may be considered on a summary judgment motion. Plaintiffs submit a transcript of a Milwaukee County Circuit Court inquest containing the testimony of witnesses who observed parts of the incident involving Miller and Thurman. Defendants argue that consideration of such evidence is improper.[2]

I decide a summary judgment motion based on "the pleadings, depositions, answers to interrogatories and admissions on file together with affidavits if any." Fed. R.Civ.P. 56(c). However, the particular forms of evidence mentioned in the rule are not the exclusive means of presenting evidence on a Rule 56 motion. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* (1998) § 2721, at 366 (3d ed.). A court may consider any information that would be admissible or usable at trial. *Aguilera v. Cook County Police & Corr. Merit Bd.*, 760 F.2d 844, 849 (7th Cir.1985) (citing Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *supra*); *see also Schy v. Susquehanna Corp.*, 419 F.2d 1112 (7th Cir.1970) (court considered copy of proxy statement); *Oglesby v. Coca–Cola Bottling Co.*, 620 F.Supp. 1336, 1344 (N.D.Ill.1985) (indicating that court may consider documentary exhibits that bear earmarks of reliability and trustworthiness).

The critical question in determining whether evidence may be considered on a summary judgment motion is not the form in which the evidence is submitted, in this case the transcript of the inquest, but whether the testimony contained in the transcript could be put into admissible form. Edward Brunet, *Summary Judg-ment Materials,* 147 F.R.D. 647, 656 (1993).

> Courts have routinely considered documents in deciding summary judgment motions. Yet, at the time of their attempted submission for summary judgment purposes, the *form* of these documents is hearsay in nature; a letter, for example, will not be sworn to by the signatory. Nonetheless, courts … do admit and rely upon letters and other documents that constitute evidence potentially admissible at trial.

*Id.* at 656–57.

The testimony that plaintiffs ask me to consider would clearly be admissible in evidence because it consists of the observations of eyewitnesses. Moreover, the testimony bears the earmarks of reliability because it was presented at a proceeding before a judge and jury, and the witnesses were duly sworn. *See* Wis. Stat. § 979.05. That defendants were not able to cross-examine the witnesses at the inquest does not make the evidence improper. Affidavits may be considered on summary judgment but are not subject to cross-examination.

The issue is similar to that presented in *Arceo v. City of Junction City, Kan.,* 182 F.Supp.2d 1062, 1080 (D.Kan.2002). There the court held that grand jury testimony could be considered on a summary judgment motion. The court relied in part on the language of *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, that the non-moving party need not produce evidence "in a form that would be admissible at trial" so long as the substance of the evidence was admissible. *Arceo,* 182 F.Supp.2d at 1081. In the present case the substance of the testimony in question would be admissible and

---

2. Defendants also oppose plaintiff's request that I consider police reports. Because I have found it unnecessary to review such reports, I need not address this issue.

thus is properly considered on a summary judgment motion.

## III. SECTION 1983 CLAIM

■ Title 42 U.S.C. § 1983 states that: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In order to prove a violation of § 1983, plaintiffs must show that defendants deprived Thurman of a federal constitutional right while acting under color of state law. *Abraham v. Piechowski*, 13 F. Supp 2d 870, 879 (E.D.Wis.1998).

### A. Under Color of State Law

In the present case defendants do not dispute that Miller was acting under color of state law. Moreover, the evidence indicates that, although off duty, Miller meets the "under color" requirement. He was acting pursuant to a Milwaukee Police Department rule providing that officers are "always subject to duty" even when they are "technically 'off-duty.'" *See* MPD Rule 4 § 2/02500; *Davis v. Murphy*, 559 F.2d 1098 (7th Cir.1977) (holding that regulation requiring officer to be on duty twenty-four hours a day was important factor in under color of state law inquiry). Miller also shot Thurman with a department-issued weapon. This factor has also been considered to be relevant to the under color of state law analysis. *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir.1975). *See generally* Steve Libby, *When Off–Duty State Officials Act Under Color of State Law for the Purposes of Section 1983*, 22 Mem. St. U.L.Rev. 725 (1992).

Defendants, however, do dispute the issue of whether Miller deprived Thurman of a federal constitutional right. I now turn to that issue.

### B. Reasonableness of Seizure

■ The Fourth Amendment protects persons against unreasonable searches and seizures. U.S. Const. amend. IV. All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop or other "seizure" of a citizen who is not in custody are analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Thus, in analyzing plaintiffs' claims, the first question is whether a seizure occurred. *Johnson v. City of Milwaukee*, 41 F.Supp.2d 917, 924 (E.D.Wis.1999).

■ In *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a seizure occurs when a government actor "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *See also Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person."). When law enforcement officers are pursuing an individual a seizure can be a process or continuum, *United States v. Bradley*, 196 F.3d 762 (7th Cir.1999). Nevertheless, a seizure "requires an intentional acquisition of physical control." *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).

■ The evidence in the present case indicates that two seizures occurred. The first seizure took place when Miller grabbed Thurman outside of his garage after observing him with the lawn mower. This seizure ended when Thurman slipped

out of his shirt and ran away. The second seizure occurred when Miller caught Thurman after pursuing him in the van and on foot. Plaintiffs challenge the reasonableness of the second seizure.

In assessing reasonableness I consider the totality of the circumstances and balance the extent of the intrusion against the need for it. *Garner*, 471 U.S. at 5, 8–9, 105 S.Ct. 1694. In *Garner*, the Supreme Court addressed the issue of deadly force and held that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12, 105 S.Ct. 1694. In applying this standard to the use of nondeadly force, the Court in *Graham*, articulated three factors that determine whether force was reasonable: (1) "the severity of the crime;" (2) "whether the suspect poses an immediate threat to the safety of the officer or others;" and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force necessary in a particular situation. *Id.* at 397, 109 S.Ct. 1865. Further, the reasonableness inquiry is an objective one: whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. *Id.*

In the Seventh Circuit the test of whether a search and seizure challenged under the Fourth Amendment is unlawful is the same as the test of negligence at common law: unreasonableness in the circumstances. *Villanova v. Abrams*, 972 F.2d 792, 796 (7th Cir.1992). In *Villanova*, Judge Posner expressed this test in terms of Learned Hand's famous formula for negligence, $B < PL$, where B is the burden of precautions, L is the loss if there is an accident that the precautions could have prevented, and P is the probability of an accident if the precautions are not taken. *Id.*; *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947); *Johnson*, 41 F.Supp.2d at 925.

In assessing whether a police shooting is reasonable the totality of the circumstances is not "limited to the precise moment when [the officer] discharged his weapon." *Deering v. Reich*, 183 F.3d 645, 649 (7th Cir.1999). Rather, I must assess "all of the events that occurred around the time of the shooting." *Id.* at 652. The actions of the police officer that led to the shooting are relevant. *Estate of Starks v. Enyart*, 5 F.3d 230, 233–34 (7th Cir.1993). An officer who shoots a suspect in an effort to protect himself cannot escape liability if the danger he faced was created by his own unreasonable conduct. *Id.* at 234. The reasonableness inquiry requires a court to "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Plakas*, 19 F.3d at 1150 (relying on *Tom v. Voida*, 963 F.2d 952 (7th Cir. 1992)).

Applying the foregoing principles and taking the evidence in the light most favorable to plaintiffs, I conclude that a reasonable jury could find that Miller's seizure of Thurman was unreasonable in the circumstances. A reasonable jury could conclude that Miller's conduct created a high proba-

bility of serious harm and was unjustified by any offsetting potential benefit to the public.

■ Thurman did not pose an immediate danger to the safety of anyone. The offense that he had committed, stealing a lawn mower from a garage, did not involve violence or the threat of violence. He did not possess a weapon, and he was not driving a car. Further, Miller had found out from Spencer where Thurman lived, thus it is unlikely that Thurman could have avoided apprehension for long. The fact that he had fled from Miller was of marginal significance because it did not make him more dangerous, because he may not have known Miller was a police officer, and because Miller knew where to find him. There was evidence in the record indicating that Miller did not identify himself as a police officer during either of his seizures of Thurman.

Moreover, Miller could have, but failed to, take precautions that would have decreased the probability of physical harm. Most importantly, before pursuing Thurman, he could have called 911 and requested backup or asked his wife to do so. Had Miller or his wife called for backup, a number of uniformed officers would have immediately appeared on the scene and could have pursued Thurman with or without Miller's assistance. They would have been in a much better position to arrest Thurman safely than Miller was by himself.

Miller knew that he should have called for backup. He testified in his deposition that nine out of ten times he would have done so, but that he did not in the present case. There was no downside to calling for backup. On the contrary, it would have increased the likelihood that Thurman would have been promptly arrested and diminished the probability that someone would be harmed in the process. In

the terminology of the Hand formula the burden of precautions, "B," was zero.

On the other hand, by pursuing Thurman on his own, Miller created a high probability that either he or Thurman would be injured or killed. Miller already knew from his struggle with Thurman outside his garage that it would be difficult to subdue him. He testified in his deposition that he was surprised by how strong Thurman was. Miller also knew that Thurman was disposed to flee from him if he could. Further, even assuming that Thurman could have been safely subdued, Miller possessed no handcuffs or other instrument to restrain him. Thus, the evidence suggests that Miller's attempt to arrest Thurman by himself was extremely imprudent.

The record contains other evidence suggesting that Miller was likely to injure or kill Thurman. In fact, the evidence indicates that Miller pursued Thurman with the conscious purpose of harming him. One of the witnesses testified that Miller told his wife that the reason that he was going after Thurman was "to beat him down some more." (Pls.' Resp. to Defs.' Proposed Findings of Fact, Ex. 1 at 15–24.)

Additionally, Miller's conduct suggests that he was in an emotional state that impaired his capacity to make reasoned judgments. A reasonable jury could infer from his decisions to have a boy accompany him while he pursued Thurman, and to drive sixty-five or seventy miles an hour in an alley where children were playing, that he was not behaving rationally. His judgment may have been impaired because the incident involved him personally. Miller acknowledged in his deposition that he was concerned by Thurman's presence proximate to his family. If Miller was as highly wrought as the evidence suggests, this too

would have increased the likelihood of harm.

For the foregoing reasons, the probability that by not taking the precaution of requesting backup, Miller's conduct would lead to someone being physically harmed, the "P" in the Hand formula, was extremely high.

Finally, the "L" in the Hand formula, the loss that could have been prevented if precautions were taken, was significant. Miller was armed and headed for a confrontation that was likely to precipitate violence. It was entirely predictable that he would have to use his weapon to acquire physical control over Thurman. The loss that could have been prevented had he requested backup and behaved more deliberately, was death or serious injury.

Thus, application of the Hand formula, $B < PL$, leads to the conclusion that a reasonable jury could find that Miller's seizure of Thurman was unreasonable in the circumstances. The burden of precautions was nonexistent, and the probability that failure to take such precautions would lead to serious injury or the loss of life was high.

■■■■ The City argues that Miller acted reasonably when he shot Thurman, because Thurman was resisting Miller's effort to subdue him. However, as previously indicated, the reasonableness inquiry is not "limited to the precise moment when [the officer] discharged his weapon." *Deering*, 183 F.3d at 649. The reasonableness inquiry requires scrutiny of the conduct leading up to the shooting. *Johnson* 41 F.Supp.2d at 929. If the officer's own unreasonable conduct created the danger that required him to use deadly force the officer may be liable under § 1983. *Estate of Starks*, 5 F.3d at 234. In the present case a reasonable jury could reach that conclusion.

## C. Qualified Immunity

■■■■ Defendants argue that summary judgment must be granted based on qualified immunity. Under the doctrine of qualified immunity "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court explained how to address the qualified immunity issue on a summary judgment motion in an excessive force case. The initial inquiry is whether taking the facts in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. *Id.* at 201, 121 S.Ct. 2151. In the present case I have already determined that, taking the evidence in the light most favorable to plaintiffs, Miller violated Thurman's right under the Fourth Amendment to be free of unreasonable seizures.

■■■■ The second sequential step is to ask whether the right was clearly established at the time of the alleged violation. *Id.* "The relevant, dispositive inquiry in determining whether the right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. The burden of establishing the existence of a clearly established constitutional right is on the plaintiff, and it is a heavy one because qualified immunity is designed to shield from civil liability " 'all but the plainly incompetent or those who knowingly violate the law.' " *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir.1989) (quoting *Malley v.*

*Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

■ In the present case the question of whether Miller was on notice that his conduct was unreasonable depends on the resolution of factual issues that are presently disputed. Taking the facts in the light most favorable to plaintiffs, Miller is not entitled to qualified immunity. As an objective matter, on August 3, 1996, a reasonable police officer would have known that it was unreasonable to precipitate a physical confrontation with a nonviolent and unarmed offender without calling for backup, without identifying himself as an officer, and with the intent to physically harm the offender. Qualified immunity is not designed to shield from civil liability the plainly incompetent. *Malley,* 475 U.S. at 341, 106 S.Ct. 1092. If Miller committed the acts alleged by plaintiffs his conduct may well fall into this category. Thus, summary judgment based on qualified immunity is inappropriate.

## IV. STATE LAW CLAIMS

Plaintiffs also bring state law assault and battery and wrongful death claims against defendants. The supplemental jurisdiction statute permits federal courts to assert jurisdiction over an entire action containing both federal and state claims. 28 U.S.C. § 1367. I have supplemental jurisdiction over state law claims "that are so related" to federal claims over which I have jurisdiction "that they form part of the same case or controversy." In the present case plaintiffs state law claims arise out of the same facts as their § 1983 claim and should be tried in one judicial proceeding. Thus, I will retain jurisdiction over them.

■ I now turn to defendants' motion for summary judgment with respect to such claims. Under Wisconsin law a battery or assault and battery is a common law tort that has been defined as an inten-

tional contact with another, which is unpermitted. *McCluskey v. Steinhorst,* 45 Wis.2d 350, 357, 173 N.W.2d 148 (1970). A wrongful death claim is authorized by statute and may be brought where the deceased was killed by the wrongful or negligent act of another. *See* Wis. Stat. § 895.04.

■ Defendants argue that summary judgment must be granted on both state law claims because the acts on which the claims are based are protected by the governmental immunity conferred by Wis. Stat. § 893.80(4). Section 893.80(4) bars suits against public employees based on acts performed in the exercise of "legislative, quasi-legislative, judicial or quasi-judicial functions." The acts covered by immunity are generally known as discretionary acts. *Johnson,* 41 F.Supp.2d at 932. The general rule is that public employees are immune from acts within the scope of their public office. *Barillari v. City of Milwaukee,* 194 Wis.2d 247, 533 N.W.2d 759 (1995).

■ Wisconsin recognizes four exceptions to the general rule of immunity under section 893.80(4). Immunity does not apply to the performance of (1) ministerial duties; (2) duties to address a "known danger;" (3) action involving medical discretion; and (4) actions that are "malicious, willful and intentional." *Willow Creek Ranch, L.L.C. v. Town of Shelby,* 235 Wis.2d 409, 425, 611 N.W.2d 693 (2000). "Malice" in the legal sense connotes "wrongful intention" as in "[t]he intent, without justification or excuse, to commit a wrongful act." Black's Law Dictionary 968 (7th ed.1999). "Reckless disregard of the law or of a person's legal rights" can also constitute malice. *Id.*

■ Plaintiffs argue that summary judgment may not be granted on the basis of immunity under section 893.80(4) be-

cause a reasonable jury could conclude that Miller's conduct was malicious, willful and intentional. Generally, under Wisconsin law the decisions of how and when to arrest an individual involve discretion. *See Sheridan v. City of Janesville*, 164 Wis.2d 420, 474 N.W.2d 799 (Ct.App.1991). However, taking the facts in this case in the light most favorable to plaintiffs, a reasonable jury could find that Miller's conduct was malicious, willful and intentional. There was evidence in the record that Miller told his wife that his intent in pursuing Thurman was "to beat him down some more." (Pls.' Resp. to Defs.' Proposed Findings of Fact, Ex. 1 at 15, 24.) This testimony suggests that Miller acted with a wrongful intention and/or in reckless disregard of Thurman's legal rights. Thus, summary judgment on the state law claims must be denied.

## V. CONCLUSION

**THEREFORE, IT IS HEREBY ORDERED** that defendants' motion for summary judgment on plaintiffs' excessive force claim against defendant Miller and plaintiffs' assault and battery and wrongful death claims against defendant Miller and defendant City of Milwaukee is **DENIED**.

**IT IS FURTHER ORDERED** that all other claims, including all claims against Arthur Jones, are **DISMISSED**, and that the caption is **AMENDED** to delete Arthur Jones as a party.