**Barbara J. BROWN, Plaintiff,**

v.

**CITY OF MILWAUKEE and Michael Garcia, Defendants.**

No. 02–C–0178.

United States District Court,
E.D. Wisconsin.

Oct. 21, 2003.

Curry First, Lawrence C. Albrecht, First, Blondis, Albrecht, Bangert & Novotnak, Milwaukee, WI, for Plaintiff.

Susan Lappen, Milwaukee City Attorney's Office, Milwaukee, WI, for Defendants.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Barbara J. Brown brings this action under 42 U.S.C. § 1983 against defendants City of Milwaukee ("the City") and Milwaukee police officer Michael Garcia ("Garcia"),[1] alleging that defendants violated her Fourth Amendment rights by subjecting her to an unreasonable seizure. Plaintiff also brings due process and equal protection claims, as well as claims alleging violations of state tort and open records laws. Defendants now move for summary judgment on all of plaintiff's claims,

and plaintiff moves for partial summary judgment on her open records law claim.

### I. FACTS

On January 29, 1998 at approximately 7:00 p.m., a Milwaukee police officer broadcast a general dispatch report stating that a woman driving a two-tone maroon van north on North 35th Street in the City of Milwaukee possessed a gun. North 35th Street is a major arterial roadway. The parties dispute whether the woman in the van committed any offense. One officer testified that "shots [may have been] fired," (Def.'s Ex. C at 10), and another testified that the woman may have stolen the van. However, it is unclear from the record what, if anything, aside from possessing a gun, the woman identified in the dispatch report actually did.

The parties also dispute exactly what the dispatch report said. Plaintiff asserts that it indicated only that the woman was driving a van and had a gun. Defendants claim that the report indicated that a gun was used. Once again, however, the record contains no evidence enabling me to resolve this factual dispute.

A few minutes after the dispatch, defendant Garcia and his partner observed plaintiff in a maroon and beige van heading north on North 35th Street. Plaintiff, a fifty-five year old African–American woman, was, at the time, a teacher and guidance counselor in the Milwaukee Public Schools. Believing that plaintiff might be the woman identified in the dispatch report, the officers immediately activated their emergency lights and pulled her

---

1. Plaintiff also names as parties several John Doe defendants, although she appears to have abandoned any claims against them. Parties may be identified by fictitious names only under exceptional circumstances. *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir.1997) ("The use of fictitious names is disfavored, and the judge has an independent duty to determine whether exceptional circumstances justify such a departure from the normal method of proceeding in federal courts."). In the present case, plaintiff does not identify any exceptional circumstances; thus, any claims against unknown defendants will be dismissed, and the caption will be amended accordingly.

over. The officers also broadcast the stop on the police radio, and at least five squad cars and ten officers came to the scene. The officers blocked off the street and surrounded the van. They then shined lights at plaintiff, apparently to prevent her from seeing. They also pointed handguns, rifles and shotguns at her, and cocked their guns so that plaintiff could hear the clicking sounds of guns being prepared for firing. Several officers simultaneously shouted profanity-laced commands at her—some over a public address system—such as "get your goddamn hands out and get out of the goddamn car," "get the fuck out of the vehicle," and "shut your fucking mouth or I'll shoot." (Pl.'s Proposed Findings of Fact ("PFOF") ¶¶ 90–91.) These tactics subjected plaintiff to "sensory overload." It appears that their purpose was to frighten and disorient her.

Plaintiff states that she was terrified and confused. She complied with the officers' commands by exiting the vehicle and putting her hands on her head. The police then ordered her to walk backwards toward Garcia while keeping her hands on her head, which she did. When she reached Garcia, he prepared to handcuff her by grabbing her wrists and pulling her arms down while pushing at least one of her hands upward against her back. At this point, the officers received a radio transmission indicating that they had seized the wrong woman. Garcia released plaintiff, and the officers explained what had happened. They observed that plaintiff was trembling and crying and appeared to be traumatized. She appeared too upset to drive; thus, one of the officers prepared to drive her home. However, shortly thereafter, a friend arrived and drove plaintiff home.

Later that evening, plaintiff went to the emergency room of a local hospital where she was treated for injuries to her arm, neck and shoulder. Plaintiff asserts that when Garcia pulled her arms, he tore a ligament causing her to suffer permanent shoulder and neck pain. Plaintiff also asserts that as a result of the entire incident she suffered from post-traumatic stress disorder for which she received medical treatment.

Plaintiff requested information about the incident under the state open records law and alleges that neither the officers involved nor the City timely or fully complied with her requests. Apparently, no official police report of the incident was prepared.

Additional facts will be stated in the course of the decision.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be "genuine," the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be "material," it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment, *Anderson*, 477 U.S. at 255, 106 S.Ct.

2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. The movant may meet its burden by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. Once the moving party's initial burden is met, the nonmoving party must go beyond the pleadings and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir. 1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

## III. SECTION 1983 CLAIMS

In order to succeed on a claim under § 1983, a plaintiff must show that (1) the defendants deprived her of a federal constitutional right, and (2) the defendants acted under color of state law. *E.g., Reed v. City of Chicago,* 77 F.3d 1049, 1051 (7th Cir.1996); *Estate of Thurman v. City of Milwaukee,* 197 F.Supp.2d 1141, 1147 (E.D.Wis.2002). In the present case, it is undisputed that defendants were acting under color of state law. The only issue is whether plaintiff was deprived of a right secured by the Constitution. Plaintiff alleges that defendants violated her rights under the Fourth Amendment and her rights to due process and equal protection.

### A. Fourth Amendment Claim

#### 1. Reasonableness of Seizure

##### a. Applicable Legal Standards

The Fourth Amendment protects persons against "unreasonable searches and seizures." U.S. Const. amend. IV. Plaintiff's Fourth Amendment claim has two components: (1) whether the officers seized plaintiff without reasonable suspicion that she had committed a crime, and (2) whether, even if they had reasonable suspicion, the officers used tactics that were unreasonably intrusive under the circumstances or, put differently, excessive in relation to the danger she posed.

An investigatory stop not amounting to an arrest is authorized if the officer is able to point to "specific and articulable facts" that give rise to a reasonable suspicion that a crime is about to be or has been committed. *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Wimbush,* 337 F.3d 947, 949 (7th Cir.2003). "Reasonable suspicion" must be based on some "objective manifestation" that the suspect is involved in criminal activity. *Wimbush,* 337 F.3d at 949 (citing *United States v. Swift,* 220 F.3d 502, 506 (7th Cir.2000)). Although the police may not detain a suspect based merely on a hunch, the likelihood of criminal activity need not rise to the level required for probable cause to arrest and falls well short of meeting the preponderance of the evidence standard. *Id.* (citing *United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 151

L.Ed.2d 740 (2002)). In evaluating the reasonableness of a stop, courts must examine the totality of the circumstances known to the officer at the time of the stop. *Id.* at 950 (citing *United States v. Jackson,* 300 F.3d 740, 745–46 (7th Cir. 2002)).

■■■ To qualify as a lawful *Terry* stop, a detention must be limited in scope and executed through the least restrictive means. *United States v. Ienco,* 182 F.3d 517, 523 (7th Cir.1999); *see also Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."). Probable cause, not merely reasonable suspicion, may be required when the police restraint is so intrusive that, while not technically an "arrest," it may be "tantamount" to an arrest.[2] *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir.1994) (citing *Dunaway v. New York,* 442 U.S. 200, 212–16, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). Thus, the reasonableness of the stop may depend, in part, on the extent of the intrusion. *Ienco,* 182 F.3d at 523. If the degree of intrusion was not reasonably related in scope to the circumstances that justified the interference in the first place, the seizure may be unreasonable under the Fourth Amendment. *See Tilmon,* 19 F.3d at 1224.

"Subtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a de facto arrest." *Tilmon,* 19 F.3d at 1224.

Because of the endless variations in the facts and circumstances, there is no litmus-paper test for determining when a seizure exceeds the permissible bounds of an investigative stop. *Id.* at 1224. Rather, the court must analyze all of the facts and circumstances of the case. *Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

■■■ When officers use force to effect a seizure, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 (internal quotation marks omitted). In *Graham,* the Court listed three relevant factors: (1) the severity of the suspected crime; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* Ultimately, the court must decide whether the means used to seize the person were excessive in relation to the danger she posed. *Jacobs v. City of Chicago,* 215 F.3d 758, 773 (7th Cir.2000); *see also Graham,* 490 U.S. at 388, 109 S.Ct. 1865 (stating that officer's conduct must be objectively reasonable under the Fourth Amendment).

Thus, in the present case I must determine:

(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts. In other

---

2. "A seizure becomes an arrest when 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Ienco,* 182 F.3d at 523 (quoting *United States v. Corral–Franco,* 848 F.2d 536, 540 (5th Cir.1988)). Probable cause to arrest exists when the officers have facts and circumstances within their knowledge and of

which they have reasonably trustworthy information that would sufficiently warrant a prudent person in believing that the suspect had committed or was committing the offense. *United States v. Scheets,* 188 F.3d 829, 839 (7th Cir.1999). There must be a "probability or substantial chance" of criminal activity by the suspect. *United States v. Sawyer,* 224 F.3d 675, 679 (7th Cir.2000).

words, the issue is whether the police conduct—given their suspicions and the surrounding circumstances—was reasonable.

*Tilmon,* 19 F.3d at 1224.

### b. Application of Standards to Seizure of Plaintiff

Whether Garcia had reasonable suspicion to stop plaintiff depends on the resolution of disputed issues of fact. Viewing the evidence in the light most favorable to plaintiff, a reasonable fact-finder could conclude that Garcia lacked reasonable suspicion to believe that plaintiff was involved in criminal activity. The dispatch report stated only that the individual possessed a gun, which is not necessarily a crime. *See Florida v. J.L.,* 529 U.S. 266, 268, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (holding that an anonymous tip that a person is carrying a gun is, without more, insufficient to justify an officer's stop and frisk of that person, and declining to adopt a "firearm exception" to the standard *Terry* analysis);[3] *United States v. Ubiles,* 224 F.3d 213, 217–18 (3d Cir.2000) (holding that because it is not necessarily a crime to possess a gun, a mere allegation that a suspect possesses a gun, without more, does not justify a stop); *United States v. Dudley,* 854 F.Supp. 570, 580 (S.D.Ind.1994) (holding that radio call alerting police to presence of two people in vehicle with guns did not provide reasonable suspicion because possession of firearms is not, generally speaking, a crime). Thus, even if Garcia had reason to believe that plaintiff was the individual described in the dispatch report, the report may not have conveyed information sufficient to establish reasonable suspicion that such individual committed or was about to commit a crime. Therefore, on the state of this record, I cannot conclude as a matter of law that the stop was reasonable.[4]

■ Neither can I conclude as a matter of law that the seizure was reasonably effected.[5] In *Tilmon,* the Seventh Circuit

---

**3.** Defendants indicate that the dispatch report was prompted by a citizen who flagged down an officer and indicated that a female in a van possessed a gun. However, because the record does not disclose whether the citizen was identified, this can be analyzed as an "anonymous tip" case under *Florida v. J.L.* In *United States v. Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Court held that a *Terry* stop based on a police bulletin or flyer from other officers is valid if the bulletin itself was based on articulable facts supporting reasonable suspicion. The present record does not disclose what additional information, if any (or from what source), the officers responsible for the dispatch possessed. Thus, construing the facts in plaintiff's favor, I can assume that the dispatch was based only on an anonymous tip.

**4.** Plaintiff assumes, *arguendo,* that Garcia possessed reasonable suspicion to stop her but argues that at some point the stop evolved into a seizure. However, given the scant record and the Supreme Court's clear statement in *Florida v. J.L.,* I cannot conclude as a matter of law that the stop was valid. In any event, plaintiff was subjected to a "seizure"

under the Fourth Amendment at the moment she was pulled over by Garcia. *See, e.g., Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief.").

**5.** I need not determine whether the seizure evolved into an arrest without probable cause. Although the officers lacked probable cause to arrest (and defendants do not argue to the contrary), it is unclear whether this encounter reached the point of an actual arrest. *See United States v. Rodriguez,* 831 F.2d 162, 166 (7th Cir.1987) (discussing factors relevant in deciding whether *Terry* stop has become an arrest). In any event, this case is appropriately analyzed as a *Terry* stop in which unreasonably intrusive methods were allegedly employed. The standard of objective reasonableness applies to the methods employed in *Terry* stops and actual arrests.

addressed whether a "show of force" employed in the seizure of an alleged bank robber was so intrusive as to be unreasonable. The officers in *Tilmon* surrounded the suspect's vehicle, drew their weapons, ordered the suspect to get out of the car and lie on the ground, and placed him in handcuffs. 19 F.3d at 1226–28. The court found that the officers' actions were reasonably related to the circumstances justifying the stop because the suspect was considered armed and dangerous and had threatened to blow up the bank with a bomb. *Id.* at 1227–28. The court reasoned that drawing weapons and ordering the suspect to lie on the ground were actions reasonably necessary for officer safety based on the perceived threat. *Id.* However, the court indicated that " 'clearly' " it was " 'near the outer edge' " of what constituted a reasonable investigative stop. *Id.* at 1227 (quoting *United States v. Serna–Barreto*, 842 F.2d 965, 968 (7th Cir. 1988)).

 If *Tilmon* was "near the outer edge," a reasonable jury could conclude that the officers' conduct in the present case crossed the line. First, taking the facts in the light most favorable to plaintiff, the officers had no reason to suspect that plaintiff had committed an offense comparable in seriousness to that suspected in *Tilmon*. In *Tilmon*, the police reasonably suspected that the defendant had just robbed a bank by threatening to blow it up with a bomb; in the present case, the officers had no reason to suspect that plaintiff had done anything more serious than possess a gun. The difference is significant because the seriousness of the conduct of which a subject is reasonably suspected is highly relevant when considering the permissible degree of intrusion in an investigatory stop. *See id.* at 1225–28.

Second, the officers' actions in the present case were considerably more intrusive than in *Tilmon*. Although in both cases the officers surrounded the suspect's car with guns drawn, in the present case, by using the sensory overload tactic, the officers went much further. They not only attempted to subdue plaintiff and to protect their own safety, but, drawing all inferences in the light most favorable to plaintiff, they attempted to terrify and disorient her. They did this by training spotlights on her so that she was unable to see, by shouting profanities such as "shut your fucking mouth or I'll shoot," and by making her believe that they were about to fire their weapons.

Third, in addition to subjecting plaintiff to sensory overload, in the present case Garcia caused plaintiff to suffer physical injury. According to plaintiff, Garcia twisted her arms causing injuries to her shoulder and neck, including a torn ligament, resulting in permanent pain and suffering. Under the circumstances of this case, none of the *Graham* factors would justify the use of force sufficient to cause plaintiff to sustain a torn ligament and permanent pain and suffering. Garcia had no reason to suspect that plaintiff had done anything more serious than possess a weapon. Plaintiff posed little or no threat to the safety of the officers. At the time Garcia allegedly twisted her arm she had complied with all of the officers' instructions and was walking backward with her hands on her head. She was not resisting in any way. Further, plaintiff was a woman in her fifties, and her physical capacity to resist was limited.

Thus, taking the facts in the light most favorable to plaintiff, a reasonable jury could conclude that Garcia acted unreasonably in the manner in which he and the other officers seized plaintiff.[6] I cannot

---

6. Although plaintiff argues that the actions of multiple officers caused the stop to be unlaw-

fully intrusive, she names only Garcia as a defendant. However, defendants do not dis-

conclude, as a matter of law, that the officers' use of the sensory overload tactic and physical handling of this fifty-five year old woman, suspected only of possessing a gun, was reasonable.

## 2. Qualified Immunity

■ Defendants argue that even if Garcia violated plaintiff's Fourth Amendment rights, he is entitled to qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ The court applies a two step sequential test for determining whether qualified immunity applies. The initial inquiry is whether, taking the facts in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If there was no violation, there is no need for further inquiry. *Id.* at 201, 121 S.Ct. 2151. In the present case I have already determined that, taking the evidence in the light most favorable to plaintiff, Garcia violated plaintiff's Fourth Amendment rights.

The second sequential step is to ask whether the right was "clearly established" at the time of the alleged violation. *Id.* "The relevant, dispositive inquiry in determining whether the right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

■ It is the plaintiff's burden to demonstrate that a right is clearly established. *Jacobs*, 215 F.3d at 766. A right is clearly established when its contours are " 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* at 767 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). To determine whether a right is clearly established, the court looks first to Supreme Court caselaw, then circuit precedent. In the absence of controlling precedent, the court may broaden its "survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.' " *Id.* (quoting *Cleveland–Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir.1989)).

However, it is not necessary that the very action being challenged has been previously held unconstitutional, so long as the unlawfulness was apparent in light of existing law. *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. As the Supreme Court recently stated:

[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, ... we [have] expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. Accordingly, ... the salient question ... is whether the state of the law [at the

pute that, if the stop was unlawfully intrusive, Garcia may be held liable for it. *See, e.g., Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir.

1985) (stating that government actors may be held jointly and severally liable under § 1983).

time of the alleged conduct] gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.

*Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *see also United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (stating that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question," even though the very action in question has not previously been held unlawful).

■ Thus, I must determine whether, in January of 1998, it would have been apparent to a reasonable police officer: (1) that he could not conduct a *Terry* stop based on a report that a woman driving a van on particular street had a gun, and (2) that he could not employ the highly intrusive tactics used to effectuate the seizure here. Taking the facts in a light most favorable to plaintiff, I conclude that while Garcia is entitled to qualified immunity from liability for the initial stop, he is not entitled to immunity from liability for the manner in which it was carried out.[7]

■ It has been well established since 1968 that in order to justify a *Terry* stop the activity of which the detainee is suspected must actually be criminal. *See Johnson v. Campbell,* 332 F.3d 199, 208 (3d Cir.2003) (citing *Ubiles,* 224 F.3d at 218); *Feathers v. Aey,* 319 F.3d 843, 850 (6th Cir.2003). As discussed, the mere possession of a gun, without more, is not a

crime. However, I cannot conclude that the state of the law in 1998 was so clear that only a "plainly incompetent"[8] officer would have conducted a *Terry* stop.

■ In 2000, the Supreme Court held that "an anonymous tip that a person is carrying a gun is, without more, [in]sufficient to justify a police officer's stop and frisk." *Florida v. J.L.,* 529 U.S. 266, 269, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). The Court rejected any "firearm exception" to the standard *Terry* analysis. *Id.* at 272, 120 S.Ct. 1375. However, prior to *J.L.* several courts—including the Seventh Circuit Court of Appeals—had reached contrary conclusions, "declaring similar searches compatible with the Fourth Amendment." *Id.* at 269, 120 S.Ct. 1375 (citing *United States v. DeBerry,* 76 F.3d 884, 886–887 (7th Cir.1996); *United States v. Clipper,* 973 F.2d 944, 951 (D.C.Cir. 1992)).

In *DeBerry,* the court noted that
> a number of cases hold, *United States v. McClinnhan,* 660 F.2d 500, 502–03 (D.C.Cir.1981); *United States v. Clipper,* 973 F.2d 944, 949–51 (D.C.Cir.1992); *United States v. Bold,* 19 F.3d 99, 103–04 (2d Cir.1994), or intimate, *United States v. Gibson, supra,* 64 F.3d at 624; *United States v. Walker,* [7 F.3d 26 (2nd Cir.1993),] *supra,* that if the tip, though only weakly corroborated in the sense just explained, is that a person is armed, the police are entitled to stop the person and search him for the gun. Armed

---

**7.** The Seventh Circuit has held that if further factual development is necessary to determine whether the officer is entitled to qualified immunity the court may deny the officer's pre-trial motion. *See Lanigan v. Vill. of East Hazel Crest, Ill.,* 110 F.3d 467, 476 (7th Cir. 1997). In the present case, further factual development is obviously needed to determine what exactly the officers knew and did at the time of the stop. In this decision, I hold only that construing the facts in the light most

favorable to plaintiff, Garcia is not entitled to qualified immunity based on the manner in which the seizure was effected. *See, e.g., Garvin v. Wheeler,* 304 F.3d 628, 633 (7th Cir. 2002) (discussing denial of motion for summary judgment on qualified immunity grounds were there were genuine issues of material fact for trial).

**8.** *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

persons are so dangerous to the peace of the community that the police should not be forbidden to follow up a tip that a person is armed, and as a realistic matter this will require a stop in all cases. For suppose DeBerry had made no threatening gesture but had simply denied in answer to the officer's question that he had a gun. Could the officer have left it at that? Or should he have asked for consent to frisk DeBerry and if DeBerry refused, insisted? The answers implicitly given by the cases we have cited are "no" and "yes," respectively. We think these answers strike the proper balance between the right of the people to be let alone and their right to be protected from armed predators.

76 F.3d at 886.[9] Thus, at the time Garcia conducted the *Terry* stop of plaintiff, his decision had some support in circuit precedent. Therefore, I find that he has qualified immunity from liability regarding the initial stop.

However, Garcia is not immune from liability based on the manner in which plaintiff was seized. Garcia and the other officers surrounded plaintiff, shined lights at her to prevent her from seeing, pointed weapons at her, cocked them and bombarded her with profanity-laced threats to shoot, based only on an anonymous tip that she had a gun. This conduct, if proven, would constitute a violation of plaintiff's clearly established rights.

First, at the time of the seizure, it "was clear that '[a]n officer's use of deadly force to apprehend a suspect is unreasonable, absent probable cause that the suspect is dangerous or has committed a violent crime.' ". *Jacobs,* 215 F.3d at 774 (quoting *McDonald v. Haskins,* 966 F.2d 292, 294–95 (7th Cir.1992)). "It was also established that holding [a] gun to a person's head and threatening to pull the trigger is a use of deadly force." *Id.* (citing *McDonald,* 966 F.2d at 295). That is essentially what happened here: Garcia and the other officers pointed their weapons—including rifles and shotguns—at plaintiff, cocked them and threatened to fire unless plaintiff "shut [her] fucking mouth." This, when they suspected her of nothing more than possessing a weapon, and she had done nothing to lead them to believe she was dangerous. As the court noted in *Jacobs,* a case in which the seizure at issue occurred in 1997:

> Under existing Seventh Circuit and Supreme Court precedent at the time the use of force occurred in this case, it appears to be clearly unreasonable for the Defendant Officers to have pointed a loaded weapon at Jacobs for an extended period of time when they allegedly had no reason to suspect that he was a dangerous criminal, ... and when Jacobs had done nothing either to attempt to evade the officers or to interfere with the execution of their duties. We therefore conclude that, taking the allegations

**9.** In *DeBerry,* the officer received a dispatch conveying an anonymous tip that at the corner of Main and Calhoun Streets was a black man wearing a tan shirt and tan shorts who had a gun in his waistband. The officer drove to that location and saw a man fitting the description. The officer approached the man and told him he wanted to talk to him. The man took several steps backward, turned slightly to the side, and moved his hands as if he might be about to draw a gun. The officer then drew his own gun and ordered the man to place his hands on the hood of the police car. When he complied, the officer holstered his gun. A backup officer arrived and the first officer then patted down the man and found a gun. *Id.* at 885. Thus, in *DeBerry,* the officers had more to go on than in the present case, where plaintiff made no furtive or threatening gestures. The holding of *DeBerry* therefore does not necessarily support Garcia's stop. Nevertheless, the court's dicta quoted above seems to.

in the complaint as true, the Defendant Officers are not shielded by qualified immunity from Jacobs' claim of excessive use of force.

*Id.* at 774.

■ Second, the officers here employed other highly intrusive tactics that went well beyond those used in *Jacobs:* at least ten officers surrounded plaintiff, lights were employed to blind her, and the officers screamed profanity-laced threats. While each of these factors, standing alone, might not be constitutionally offensive, the "whole course of conduct of an officer in making an arrest or other seizure—including verbal exchanges with a subject—must be evaluated for Fourth Amendment reasonableness in light of the totality of the circumstances." *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1194 (10th Cir.2001), *cert. denied,* 535 U.S. 1056, 122 S.Ct. 1914, 152 L.Ed.2d 824 (2002).

In *Holland,* the court denied qualified immunity to a ten-member SWAT team which, while executing an arrest warrant for a misdemeanor assault charge on April 16, 1996, swarmed a property with guns drawn and, using profane language, ordered those present—including children—to lie face down. *Id.* at 1183–84. Relying on the Seventh Circuit's *McDonald* decision, the court stated:

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time. "These are the very ingredients relevant to an excessive force inquiry." *McDonald,* 966 F.2d at 294. Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that

person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.

*Id.* at 1192–93.

The *Holland* court also criticized the officers' use of harsh language:

> Of course, in conducting a search or making a seizure, "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Michigan v. Summers,* 452 U.S. 692, 702, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Simple instructions spoken in a firm, commanding tone of voice communicate clearly what an officer wants a subject to do, and likely would be most effective, particularly in dealing with bystanders and children.
>
> In contrast, expletives communicate very little of substance beyond the officer's own personal animosity, hostility or belligerence. Such animus would be entirely misplaced ... where they have offered no resistance to the officers' initial show of force.
>
> One can be firm and direct without being foul and abusive. .
>
> In evaluating the Fourth Amendment reasonableness of a seizure, the officers' verbal interaction as well as their physical conduct become part of the totality of the circumstances to be considered. While it seems unlikely that harsh language alone would render a search or seizure "unreasonable," verbal abuse may be sufficient to tip the scales in a close case.

*Id.* at 1194.

The court further noted:

> Outfitting sheriff's deputies in hooded combat fatigues, arming them with la-

ser-sighted weapons and ordering them to conduct the "dynamic entry" of a private home does not exempt their conduct from Fourth Amendment standards of reasonableness. The "SWAT" designation does not grant license to law enforcement officers to abuse suspects or bystanders, or to vent in an unprofessional manner their own pent-up aggression, personal frustration or animosity toward others.

*Id.* at 1195. Based on this combination of factors, the court had little difficulty in concluding: "This was an invasion of a clearly established constitutional right, and the officers' mistake as to what the law requires was unreasonable under all of the circumstances." *Id.* at 1197. Similarly, defendants' labeling of the seizure in the present case a "high-risk-felony stop", (Def. Brf. at 6, ¶ 8), did not grant the officers license to abuse plaintiff. The combination of tactics employed here—spotlights, drawn weapons and profane threats to shoot—together constituted an invasion of plaintiff's clearly established constitutional rights.[10]

 Third, in the present case, plaintiff suffered physical injury, which was absent in *Holland. Id.* at 1195. Garcia grabbed plaintiff's arms and twisted them while attempting to handcuff her, tearing a ligament and causing permanent injury. While not every unnecessary use of force during a seizure violates the Fourth Amendment, *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, it is clearly established that the excessive use of force during an investigatory stop constitutes a Fourth Amendment violation, *Lanigan*, 110 F.3d at 474 (citing *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir.1996)); *see also Titran v. Ackman*, 893 F.2d 145, 146 (7th Cir. 1990) (stating that an individual's right under the Fourth Amendment "to be free

of excessive force during an arrest has long been established"). The use of force is excessive if it is not "objectively reasonable" in light of the facts and circumstances confronting the officers, without regard to their underlying intent or motivation, *Graham*, 490 U.S. at 397, 109 S.Ct. 1865; and a plaintiff can overcome a claim of qualified immunity either by (1) pointing to a closely analogous case that established a right to be free from the type of force the police officers used on her, or (2) showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment. *Clash*, 77 F.3d at 1048. Construing the evidence in plaintiff's favor, Garcia is not entitled to qualified immunity for his use of force.

The Seventh Circuit has denied qualified immunity on similar facts. In *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir.2003), the plaintiff alleged that during a police encounter on May 31, 1998, the officer unsnapped his holster and held his arms over his head as if to strike her, and that he ran at her knocking into her body with his stomach and chest. She alleged that, although she was cooperative, the officer forced her arms behind her back, twisting her arm, and over-tightening the handcuffs. As a result, she alleged that she received significant injuries. Because the court's analysis is so instructive for purposes of the present case, I quote from its opinion at length:

> The Supreme Court has noted that "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is neces-

---

**10.** Moreover, because defendants fail to explain what the underlying felony was, it is impossible to accept their characterization of this seizure as one involving high risk.

sary in a particular situation." *Graham*, 490 U.S. at 396–97[, 109 S.Ct. 1865]. Nevertheless, even given this flexibility, Officer Pauley's force in arresting a woman who was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with such minor offenses, was not objectively reasonable. *See Herzog [v. Vill. of Winnetka, Ill.,* 309 F.3d 1041, 1042–43 (7th Cir.2002) ] (refusing to loosen plaintiff's chafing handcuffs constitutes excessive force in case where complainant had violated no law, was arrested without probable cause and did not resist); *Brown v. Vill. of Evergreen Park,* No. 02 C 0236, 2002 WL 31844991, at *4 (N.D.Ill.Dec.18, 2002) (defendant alleged sufficient facts to support a claim of excessive force where he was stopped for no reason, did not resist arrest, was completely submissive and yet handcuffs applied so tightly he suffered nerve damage); *see also, Kukla v. Hulm,* 310 F.3d 1046, 1050 (8th Cir.2002) (whether police used excessive force was issue for jury where handcuffs were so tight that plaintiff sprained wrist, shoulder, and elbow, where plaintiff had committed no offense, he posed no safety threat, and made no show of resistance); *Mickle v. Morin,* 297 F.3d 114, 121–22 (2d Cir. 2002) (holding that rational juror could find use of force excessive where handcuffing caused bruising and dislocated rotator cuff and plaintiff's only offense was making nonemergency calls to 911); *Kostrzewa v. City of Troy,* 247 F.3d 633, 640–41 (6th Cir.2001) (refusing to dismiss excessive force complaint where plaintiff was arrested for making an illegal left-hand turn and application of handcuffs made wrists swollen, red, and painful); *LaLonde v. County of Riverside,* 204 F.3d 947, 959–60 (9th Cir.2000) (allowing issue of excessive force to go

jury where officers responding to noise complaint applied tight handcuffs and used pepper spray); *Heitschmidt v. City of Houston,* 161 F.3d 834, 838–40 (5th Cir.1998) (holding that, on the basis of the pleadings, the court could not conclude that the force exerted was reasonable where the police officer placed the plaintiff in tight handcuffs for four and a half hours, where plaintiff was not a target of the investigation, he did not attempt to flee, and police had no reason to suspect him of wrongdoing).

Having established the threshold question regarding the constitutional right under the Fourth Amendment, we must now complete the qualified immunity inquiry by determining whether it would have been sufficiently clear to a reasonable officer that he used excessive force in the situation he confronted. At the time of the arrest, it was clearly established that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Clash v. Beatty,* 77 F.3d 1045, 1048 (7th Cir.1996). *It was also well established that it was unlawful to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of the officer or others, and were suspected of committing only minor crimes.* See *Hill v. Miller,* 878 F.Supp. 114, 116–17 (N.D.Ill.1995) (denying summary judgment on excessive force claim where police officer pushed complainant against police car and handcuffed him so tightly that he suffered nerve damage where suspect violated no law, complied fully with officer's instructions, and did not resist arrest); *Ingram v. Jones,* No. 95 C 2631, 1995 WL 745849, at *11 (N.D.Ill. Nov. 29, 1995) (denying defendants' motion to dismiss excessive force claim where woman al-

leged that police officer forcefully grabbed and handcuffed her where she had committed no crime, did not resist, and fully complied with all of the officer's requests), *modified on other grounds by* No. 95 C 2631, 1997 WL 323538 (N.D.Ill. June 9, 1997); *Tennen v. Shier,* No. 94 C 2127, 1995 WL 398991, at *7 (N.D.Ill. June 30, 1995) (reasonable factfinder could find officer used excessive force in grabbing complainant's arm, and yanking him around by the arm, where he had violated no law and posed no physical threat to the officer); *see also Martin v. Heideman,* 106 F.3d 1308, 1312–13 (6th Cir.1997) (though amount of force used was allegedly greater than in instant case, stating that overly tight handcuffing constitutes excessive force); *Palmer v. Sanderson,* 9 F.3d 1433, 1436 (9th Cir.1993) (refusing to grant summary judgment for police officers where tight handcuffs caused pain and bruising and plaintiff passed field sobriety tests and had violated no law).

. . .

In this case, according to Payne's account, Officer Pauley confronted a woman who posed no danger to Officer Pauley or to the public, who did not resist arrest, and who was alleged to have committed a very minor, non-violent crime. If the facts as alleged by Payne are found to be true, then and only then, should it have been clear to Officer Pauley, or to any reasonable officer under these circumstances, that it would be unlawful to use the amount of force he did to arrest Payne.

*Id.* at 779–80 (footnote omitted; emphasis added).

In *Meyers v. Nagel,* No. 90–35718, 962 F.2d 14, 1992 WL 92798, at *2, 1992 U.S.App. LEXIS 10252, at *7 (9th Cir. Apr.30, 1992), the court reached a similar conclusion, denying qualified immunity when the plaintiff claimed that the officer "used excessive force when he 'put one hand up high behind [plaintiff's] back' while handcuffing him." While the record did not permit the court to determine whether excessive force was in fact used, the court held: "If the facts are as Meyers claims, the force used by Nagel may be excessive and he could not reasonably believe his actions were lawful." *Id.* at *3, 1992 U.S.App. LEXIS 10252, at *10. Thus, I find that these closely analogous cases establish a right to be free from the type of force Garcia used on plaintiff.

█ Further, as an objective matter, the force allegedly used here was so plainly excessive that Garcia would have been on notice that he was violating the Fourth Amendment. Courts have consistently held that a reasonable inference that excessive force was used may be drawn from the fact of serious injuries. *See, e.g., Santos v. Gates,* 287 F.3d 846, 855 (9th Cir. 2002) (holding that jury could infer use of excessive force, even where plaintiff did not specifically recall the incident, because plaintiff suffered broken vertebra); *Frazell v. Flanigan,* 102 F.3d 877, 883, 887 (7th Cir.1996), *abrogation on other grounds recognized by McNair v. Coffey,* 279 F.3d 463 (7th Cir.2002) (denying qualified immunity where officers caused serious injuries to plaintiff during arrest). Construing the facts in plaintiff's favor, there is nothing to suggest that Garcia was justified in using force sufficient to cause the injury alleged: a reasonable officer would know that he should not twist the arm of a non-combative, fifty-five year old woman with force sufficient to tear a ligament and cause permanent injury.[11]

---

11. In *McNair v. Coffey,* 279 F.3d 463, 465 (7th Cir.2002), the court granted qualified immunity to an officer who participated in a "high risk" traffic stop: eight squads surrounded the plaintiff, and the officers ordered him out of the car at gun point. However, *McNair* is

Therefore, for the reasons stated, Garcia's motion for summary judgment on the basis of qualified immunity will be granted as it pertains to the decision to stop plaintiff, but denied as it pertains to the manner in which the stop was effectuated.

### 3. Municipal Liability

▮ Plaintiff argues that the City is liable for the unreasonable seizure because the officers were acting pursuant to City policy. Although municipalities are not vicariously liable under § 1983 for the constitutional torts of their employees, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a § 1983 plaintiff may prevail on a claim against a municipality if she can establish that "the deprivation of constitutional rights [was] caused by a municipal policy or custom." *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir.2003) (internal quotation marks and citation omitted). Unconstitutional policies or customs can take three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) a constitutional injury that is caused by a person with final policy-making authority. *Id.* (citing *Palmer v. Marion County*, 327 F.3d 588, 594–95 (7th Cir. 2003)). In the present case, plaintiff argues that the City is liable for the unreasonable stop of her vehicle and subsequent use of the sensory overload tactic on three different theories. I will consider each in turn.

▮ First, she argues that the City has an express policy approving the use of the sensory overload tactic in certain situations and that the City was deliberately indifferent as to whether its officers were implementing the tactic unconstitutionally. The City does not dispute that it had an express policy that, under certain circumstances, officers stopping vehicles for investigative purposes were to surround the vehicle and order the driver out at gunpoint while shouting commands laced with profanities. The City admits that it trained police officers to use this tactic. Plaintiff does not contend that the City's policy was facially unconstitutional but, rather, that it was unconstitutional as applied to the stop of her vehicle. In order to establish municipal liability on the theory that a facially valid policy was implemented in a way that violated a plaintiff's constitutional rights, the plaintiff must demonstrate that the municipality was deliberately indifferent to the known or obvious consequences of the policy. *Rasche*, 336 F.3d at 599. In other words, plaintiff must show that it should have been obvious to a reasonable policymaker that the policy would lead to the deprivation of a federally protected right. *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 411, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *see also Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir.2002). "A showing of simple or even heightened negligence will not suffice." *Brown*, 520 U.S. at 407, 117 S.Ct. 1382.

Plaintiff argues that the City failed to provide any supervision, monitoring or oversight of police officers who implemented the policy, and that such failure amounted to deliberate indifference to the

easily distinguishable. In that case, the officers had probable cause to arrest the suspect, he failed to "pull over for some time," and, once he exited the car, he was "not roughed up; matters were handled peaceably." *Id.*

This case differs in critical respects: the officers lacked probable cause, their methods were more intrusive, and plaintiff was "roughed up."

policy's obvious consequences. The City does not dispute that, at the time of the incident, the policy contained no mechanism to review its use. The policy did not require officers who used the sensory overload tactic to advise their superiors of such use or document their actions and the results in reports. Plaintiff argues that it should have been obvious to the City that without supervision and monitoring the consequences of a policy endorsing such highly intrusive conduct would be that individuals' constitutional rights would be violated.

■ However, under Seventh Circuit law, a City cannot be held liable for deliberate indifference unless the plaintiff establishes that the City was or should have been aware of a *pattern* of constitutional violations caused by its policy. *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir.2000) (holding that "a single instance of allegedly unconstitutional conduct does not demonstrate a municipality's deliberate indifference to the constitutional rights of its inhabitants"). Here, plaintiff does not present evidence of a pattern of constitutional violations caused by the use of the sensory overload tactic; she refers only to her own experience. Thus, plaintiff may not prevail on her theory that the City was deliberately indifferent to the known or obvious consequences of its policy approving of the use of this tactic.

■ Plaintiff's second argument in support of her municipal liability claim is that Garcia had final policymaking authority with respect to the procedures used at the scene of plaintiff's stop because his actions were not subject to supervision or review after the fact. "In order to have final policy-making authority, an official must possess 'responsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'" *Rasche*, 336 F.3d at 599 (quoting

*Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir.1992)). A person's status as a final policy-maker under § 1983 is a question of state or local law. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Final policymaking authority may be granted directly by statute or delegated or ratified by an official having such authority. *Id.* The Seventh Circuit has further elaborated on the term "final":

> *Every* public employee, including the policeman on the beat and the teacher in the public school, exercises authority ultimately delegated to him or her by their public employer's supreme governing organs. A police officer has authority to arrest, and that authority is "final" in the practical sense that he doesn't have to consult anyone before making an arrest; likewise a teacher does not have to consult anyone before flunking a student. That is a perfectly good use of the word "final" in ordinary conversation but it does not fit the cases; for if a police department or a school district were liable for employees' actions that it authorized but did not direct, we would be back in the world of respondeat superior. To avoid this the cases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority.

*Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir.2001), *cert. denied*, 535 U.S. 1017, 122 S.Ct. 1606, 152 L.Ed.2d 620 (2002).

Garcia's role in the present case is similar to the "policeman on the beat" described in *Gernetzke*. His decision to use the sensory overload tactic in the course of his investigatory stop of plaintiff was an exercise of authority delegated to him by

the City. However, his exercise of such authority was not "final" in the sense that § 1983 requires. Although plaintiff argues that the City delegated such authority to its officers by failing to require them to file formal reports after employing the procedure, this argument ignores the fact that the City trained officers to use the procedure and identified the circumstances under which it was to be used.[12] Therefore, Garcia did not have final policymaking authority concerning the procedures employed when plaintiff was stopped.

Plaintiff's final argument relating to municipal liability is that even if Garcia lacked final policymaking authority, the City "ratified" his conduct by failing to adequately investigate and punish him for his use of the sensory overload tactic. A municipality will be held liable under § 1983 on a ratification theory if a municipal official having final policymaking authority approves a subordinate's decision and the basis for it. *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir.1998). However, "a plaintiff cannot establish a § 1983 claim against a municipality by simply alleging that the municipality failed to investigate an incident or to take punitive action against the alleged wrongdoer." *Id.; see also Gernetzke*, 274 F.3d at 469–70. Thus, the City's failure to investigate or punish Garcia does not give rise to municipal liability. Plaintiff also argues that by not requiring officers to file reports after employing the sensory overload tactic, the City implicitly ratified every use of sensory overload by its officers. However, the City's failure to require formal reports to be filed after every use is not the same as affirmative approval of every use. Consequently, plaintiff's argument that the City is liable under § 1983 because it ratified Garcia's actions fails. Thus, defendants' motion for summary judgment will be granted on plaintiff's Fourth Amendment claim against the City.

## B. Equal Protection and Due Process Claims

Plaintiff also raises several equal protection and due process claims. She argues that by subjecting her to excessive force Garcia acted arbitrarily or with a racial motivation, violating her right to equal protection. A state official may violate an individual's right to equal protection by treating her differently than other similarly situated individuals without a rational basis or because of the individual's race. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564–65, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (holding that Equal Protection Clause is violated when government treats individual differently from others similarly situated without any rational basis); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (holding that government's intentional race discrimination violates Equal Protection Clause). However, other than showing that Garcia may have used excessive force and that she is an African–American, plaintiff adduces no evidence in support of her equal protection claim. She does not present evidence that Garcia intentionally discriminated against her or that he treated her differently than others similarly situated. Nor does she present authority supporting her argument that the facts she alleges add up to an equal protection claim. Thus, defendants' summary judgment motion with respect to this claim will be granted.

Plaintiff also alleges that the City failed to timely and fully respond to her requests under the state open records law. She claims that this was part of a "cover-

---

12. Plaintiff does not allege that the City failed to adequately train officers concerning the circumstances under which the sensory overload procedure was to be used.

up" of the illegal seizure, which violated her rights to due process and equal protection.

The Due Process Clause has a substantive and a procedural component, and the deprivation of either may give rise to a claim under § 1983. *Bigby v. City of Chicago,* 766 F.2d 1053, 1058 (7th Cir. 1985). In order to establish a procedural due process claim, the plaintiff must show that she was deprived of liberty or property without having been given notice and an opportunity to be heard prior to the deprivation. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). A procedural due process claim pertains not to the deprivation itself but only to the adequacy of the procedures employed. *Kauth v. Hartford Ins. Co. of Ill.,* 852 F.2d 951, 955–56 (7th Cir.1988). In the present case, plaintiff claims a property interest in obtaining public records but does not allege any defect in the procedure by which she was deprived of such interest.[13] Thus, her procedural due process claim against the City fails.

A substantive due process claim challenges governmental action regardless of the fairness of the procedure used to implement such action. *Wudtke v. Davel,* 128 F.3d 1057, 1062 (7th Cir.1997). Most of the Supreme Court's substantive due process decisions involve the deprivation of some fundamental right that the Court characterizes as a liberty interest. *See, e.g., Roe v. Wade,* 410 U.S. 113, 154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (involving right to an abortion). In the present case, plaintiff claims that she has a liberty interest in protecting her reputation, which the City infringed by denying her open records requests. However, she provides no authority supporting the proposition that substantive due process includes the right to obtain public records in order to protect one's reputation.[14] Further, even if there were such a right, plaintiff presents no evidence indicating how her reputation was harmed or how the City's alleged failure to respond to her requests for records contributed to such harm. Thus, plaintiff's substantive due process claim against the City must also be dismissed.

Plaintiff also argues that the City had no rational basis for failing to adequately respond to her open records requests and that it therefore violated her right to equal protection. To establish an equal protection violation, plaintiff must allege that, based on some classification, the City treated her differently from similarly situated individuals. *Olech,* 528 U.S. at 564, 120 S.Ct. 1073 (holding that a "class of one" may bring a successful equal protection claim where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment). In the present case, plaintiff presents no evidence suggesting that the City acted with a discriminatory intent or that it treated similarly situated individuals differently than she. Thus, her equal protection claim against the City must also be dismissed.

**13.** Wisconsin has a procedure by which aggrieved applicants can obtain public records—its open records law. Under the law, if an applicant for a record believes that the record is being improperly withheld, she may bring an action to compel its disclosure and may obtain damages, costs and attorneys' fees. Wis. Stat. § 19.37. Plaintiff does not claim that this procedure is defective.

**14.** The Supreme Court has held that mere injury to reputation does not constitute a deprivation of liberty. *Conn. Dep't of Pub. Safety v. Doe,* 538 U.S. 1, 123 S.Ct. 1160, 1162, 155 L.Ed.2d 98 (2003) (citing *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)).

## IV. STATE LAW CLAIMS

Plaintiff also brings several state law claims. Although it is not entirely clear, she appears to allege claims of battery and negligence against Garcia, as well as a claim under the state open records law against the City.

### A. Claims Against Garcia

■■■■ I have supplemental jurisdiction over state law claims "that are so related" to pending federal claims "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). For claims to be part of the same case or controversy, they must arise out of a common nucleus of operative fact. *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995). "A loose factual connection between the claims is generally sufficient." *Id.* I have supplemental jurisdiction over plaintiff's state law claims against Garcia because they arise out of the same incident as her Fourth Amendment claim.

■■■■ Garcia argues that he is immune from liability in connection with plaintiff's state law claims. Wis. Stat. § 893.80(4) affords municipal employees immunity from suit for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." The terms "quasi-legislative" or "quasi-judicial" are synonymous with "discretionary." *Scarpaci v. Milwaukee County*, 96 Wis.2d 663, 683, 292 N.W.2d 816 (1980). Plaintiff concedes that when Garcia pulled her arms he was performing a discretionary act, but she contends that his conduct fell within an exception to immunity under § 893.80(4) because it was "malicious, willful, and intentional." *See Willow Creek Ranch, L.L.C. v. Town of Shelby*, 235 Wis.2d 409, 425, 611 N.W.2d 693 (2000). "Malice" means "[t]he intent, without justification or excuse, to commit a wrongful act." Black's Law Dictionary 968 (7th ed.1999).

"Reckless disregard of the law or a person's legal rights" can also constitute malice. *Id.; see also Thurman*, 197 F.Supp.2d at 1151. Garcia does not respond to plaintiff's contention that he is not immune because his conduct was malicious, willful and intentional.

■■■■ Under state law, a police officer may be liable for the intentional tort of battery if he uses excessive force in making an arrest. *See Kofler v. Florence*, 216 Wis.2d 41, 45, 573 N.W.2d 568 (Ct.App. 1997). There is evidence in the record that Garcia unreasonably used enough force to cause plaintiff to suffer a torn ligament and chronic pain. Thus, taking the facts in the light most favorable to plaintiff, I cannot conclude as a matter of law that his conduct was not malicious, willful and intentional, or that a reasonable jury could not find that he committed a battery. Thus, with respect to plaintiff's battery claim against Garcia, defendants' motion for summary judgment will be denied.

In her complaint, plaintiff may also allege that Garcia was negligent. If so, however, plaintiff has abandoned this claim by failing to discuss or support it in her summary judgment briefs. Further, under § 893.80(4), Garcia would be immune from liability for mere negligence. Thus, any negligence claim will be dismissed.

### B. Open Records Law Claim Against City

Plaintiff moves for summary judgment on the issue of liability on her claim under the state open records law. That claim, however, raises a host of issues that have not been adequately addressed in the briefs. Therefore, I will deny the motion without prejudice.

## V. CONCLUSION

Therefore, for the reasons stated,

**IT IS ORDERED** that defendants' motion for summary judgment on plaintiff's § 1983 claim against Garcia based on the Fourth Amendment is **GRANTED** in part and **DENIED** in part, as stated herein; defendants' motion for summary judgment on plaintiff's § 1983 claim against the City based on the Fourth Amendment is **GRANTED**; defendants' motion for summary judgment on plaintiff's § 1983 claims based on the Due Process and Equal Protection Clauses is **GRANTED**; and defendants' motion for summary judgment on plaintiff's state law negligence claim is **GRANTED**, and on plaintiff's state law battery claim is DENIED.

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment on her claim that the City violated the state open records law is **DENIED** without prejudice.